IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NORMA BELASCO, | ) | CASE NO.  1:13 CV 546 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| WARRENSVILLE HEIGHTS CITY | ) | |
| SCHOOL DISTRICT, et al., | ) | |
| | ) | |
| Defendants. | ) | **MEMORANDUM OPINION** |

This matter is before the Court on the Motion for Summary Judgment filed by

Defendants, Warrensville Heights City School District; Felicia Woods-Wallace and Darlene

Bushley.  (Docket #33.)   Pursuant to Fed. R. Civ. P. 56, Defendants seek summary judgment as

to all of the claims asserted by Plaintiff, Norma Belasco.

I.      **Factual Background.**

Ms. Belasco was a teacher in the Warrensville Heights City School District during the

1998-99 school year, and then from 2005-2012.  (Declaration of Norma Belasco at ¶ 9.)  From

2005-2011, Ms. Belasco was teacher for gifted and talented students.  (Brief in Opposition at p.

3.)  In 2010, Ms. Belasco was assigned to Eastwood Elementary school under Principal Felicia

Woods-Wallace.  (Deposition of Felicia Woods-Wallace at p. 12.)  The funding for the gifted

program was eventually cut and Ms. Belasco was assigned to a regular fourth grade classroom for

the 2011-12 school year.  (Id. at pp. 12-13.)

From 2007 through 2013, Ms. Belasco suffered from renal failure and required dialysis. (Deposition of Norma Belasco at p. 20.)  In the fall of 2012, Ms. Belasco required dialysis 3 times per week.  (Brief in Opposition at p. 8; Deposition of Norma Belasco at pp. 7-9.)  Due to her condition, Ms. Belasco experienced pain and discomfort; had difficulty balancing; suffered from shortness of breath; had occasional cramps in her arms and legs; and, needed to use a walker at times.  (Id. at p. 8.)  Ms. Belasco testified during deposition that she used her walker during the school day because she would get very tired when walking.  (Id. at p. 23.)  Ms. Belasco received a kidney transplant on April 9, 2013.  (Declaration of Norma Belasco at ¶ 10.)

During the 2011-12 school year, Ms. Belasco states that her "classroom was continually disrupted by three boys who were out of control to the point that they were beyond her ability to deal with them." (Brief in Opposition at p. 4; Deposition of Norma Belasco at pp. 21-22.)  The Parties do not appear to dispute that there were disruptive students in the class.  Ms. Belasco states that she requested help from the Principal during that time, "even if it was for only two or three hours a week," because they created a dangerous environment for her and for the other children.  (Brief in Opposition at p. 4; Deposition of Norma Belasco at p. 24.)  Ms. Belasco did not formally request a full or part-time teacher's aide at that time.  (Deposition of Norma Belasco at p. 24.)  During her deposition, Ms. Belasco stated as follows:

> Q: Why were you requesting assistance?
> A:  Because I had three boys that were dangerous . . .  I did not have any help to deal with them.  They got beyond my ability to deal with them; we're not allowed to break up fights, et cetera.

Q.  Was your inability to deal with them related to your perceived disability, what you say is your disability?
A:  Only in that I was afraid for the children's safety, but I was also afraid that they might knock me down; I might get hurt, too.

* * *

Q: Was your inability to deal with the students, as you have described it, a result of the limitations that you suffered or a result of their behaviors?
A: A result of their behavior.

Q: So when you requested assistance, you were requesting assistance to deal with their behaviors, not assistance to perform your duties as a result of the limitations that you experienced?
A: Well, they were related, obviously.

Q.  How were they related?
A: As I said, my balance and things like that were not perfect, so I was a little afraid that the children would hurt each other, but also could knock me down, which has happened with teachers.

Q: Did you ever have happen with you?
A: It didn't happen with me, but I was afraid.

(Deposition of Normal Belasco at pp. 22-23.)

### A.    District Concerns.

Defendants state that during the 2011-12 school year, numerous concerns arose regarding Ms. Belasco's job performance.  (Motion for Summary Judgment at p. 2; State Hearing Exhibit STIP-2.)  Pursuant to the Teacher Job Description, Ms. Belasco was required to implement effective pupil management procedures; maintain a positive learning environment; help parents/students understand academic objectives, behavioral standards, and performance expectations; take precautions to ensure safety; and, provide appropriate student supervision. (Motion for Summary Judgment at p. 4; State Hearing Exhibit STIP-2.)  Defendants raised concerns over Ms. Belasco's ability to manage her classroom; her ability to implement reading

-3-

curriculum and accurately report grades; her frequent absences; and, concerns about her ability to

perform the physical demands of the job. (Motion for Summary Judgment at p. 2.)

### 1.    Classroom Management

Ms. Belasco acknowledged the requirement and need for classroom management and

admitted that her "class was not controlled properly." (State Hearing Transcript at 434:1-3;

444:7-11; and 445:14-446:23.) There is also testimony from the Principal Woods Wallace (State

Hearing Transcript at 191:12-192:2; 193:11-15); the School Security Guard, Frankie Melton

(State Hearing Transcript at 22:24-23:43; 22:5-7); Human Resources Director Bushley (State

Hearing Transcript at 642:13-644:11 and 752:14-753:23) and, the School Secretary, Patricia

Cartwright (State Hearing Transcript at 37:2-20), that Ms. Belasco's classroom was not

controlled properly.[1]

Ms. Belasco states that she "asked for the accommodation" of having another adult in the

classroom to watch the three children while she was writing on the board and also requested the

three children be separated from each other in different classrooms. (Brief in Opposition at p. 4;

Deposition of Norma Belasco at pp. 211-25.) Ms. Belasco states that the Principal Woods-

Wallace was aware of the disruptions in her classroom but consistently refused her requests for

help. (Brief in Opposition at p. 5; Deposition of Norma Belasco at p. 24; Deposition of Principal

Felicia Woods-Wallace at p. 41.) The Court has reviewed the deposition testimony and State

Hearing testimony of several District employees, who indicated that others would step in to help

---

[1]      The Court has read all of the deposition transcripts provided by the Parties in their
entirety. The Deposition transcripts of Ms. Bushley; Ms. Woods-Wallace; Ms. Melton;
and, Ms. Cartwright are consistent with the hearing testimony regarding the conditions in
Ms. Belasco's classroom.

Ms. Belasco restore order as needed. (Deposition of Darlene Bushley at p. 23; Woods-Wallace

Depo. at pp. 39-40; Melton Depo. at pp. 17, 20, 28 and 30; State Hearing Transcript at pp. 23 37,

569, and 642-44.) Ms. Woods-Wallace testified that Ms. Belasco did not follow the District's

policy regarding how to deal with disruptive students. Ms. Belasco argues that she was never

adequately trained as to those policies and procedures.

## 2.    Reading Curriculum/Grades

During the 2011-12 school year, the District used the Action 100 Book Challenge reading

program. Ms. Belasco was responsible for implementing the mandatory program in her

classroom. (State Hearing Transcript at pp. 623-26.) The program set reading goals for the

students and required teachers to monitor student progress; conference with the students to

measure progress; and, enter reading levels and scores into a computerized system for tracking

progress. (State Hearing Transcript at pp. 121-29 and 154.) Jennifer Ervin, a teacher in the

District, was assigned to coordinate the 100 Book Challenge and assist teachers with

implementing the program. (Motion for Summary Judgment at p. 7.) Numerous training

sessions were held regarding program implementation and Ms. Ervin was available for additional

assistance as needed. (Motion for Summary Judgment at p. 7; State Hearing Transcript at pp. 86-

87 and Hearing Exhibits WH-13 and WH-14.)

The District raised concerns that Ms. Belasco did not implement the reading program as

required and did not properly enter student reading scores into the system. Ms. Ervin; Principal

Woods-Wallace; Superintendent Marva Jones; and, Ms. Bushley reviewed Ms. Belasco's system

entries and believed the entries to be false. (State Hearing Transcript at p. 496.) Ms. Belasco

asserts that the failure to record the reading data was the result of the constant disruptions in her

classroom and because she did not receive enough training or assistance regarding the program. (State Hearing Transcript at 448:12-2; 489:24-491:14.) In her Brief in Opposition, Ms. Belasco states, "There was no constructive advice or explanation of how Ms. Belasco could meet Action 100 goals in a constantly disrupted classroom." (Brief in Opposition at p. 8.) Ms. Ervin testified that Ms. Belasco missed many of the training sessions that were held and did not make those training sessions up. (Motion for Summary Judgment at p. 7; State Hearing Transcript at pp. 86-87 and 498-99 and Hearing Exhibits WH-13 and WH-14.)

In addition to the foregoing, Principal Woods-Wallace asked to review Ms. Belasco's grade book and found it did not correlate with assignments and was incomplete. (Motion for Summary Judgment at p. 8; State Hearing Transcript at pp. 230-233 and Hearing Exhibits WH-9, WH-10 and WH-11.) Ms. Belasco asserts that the District's allegations of grade falsification were unfounded because they had reviewed entries in her personal grade book – rather than the school database – and that she was permitted to keep grades in any manner she chose in her personal grade book. (Brief in Opposition at p. 12.)

### 3.   Frequent Tardies/Absences

Defendants assert Ms. Belasco was absent 26 times from the beginning of the 2011-12 school year until she was placed on paid administrative leave on January 18, 2012. (State Hearing Transcript at pp. 688-89 and State Hearing Exhibits WH-6 and WH-7.) Defendants also assert that Ms. Belasco was repeatedly tardy and the District would have to scramble to make arrangements to cover her class until she got there. Ms. Belasco testified that she does not know how many times she was absent but denied being repeatedly tardy, stating that because she would usually enter the building from the side Defendants probably didn't see her arrive and if she

-6-

signed in late in the morning it was because she had been to her classroom first. (Deposition of Norma Belasco at p. 35.) Defendants also state Ms. Belasco failed to use the District's system to log her absences so that appropriate substitutes could be found. (State Hearing Transcript at pp. 42-43 and 239.) Ms. Belasco asserts that the automated system did not work properly when she tried to use it.

### B. District Action.

On October 13, 2011, District Superintendent Marva Jones and Principal Woods-Wallace met with Ms. Belasco to discuss the aforementioned issues. (State Hearing Transcript at 200:14-201:25; 212:1-213:4; and, 260:13-261:5.) On November 1, 2011, Ms. Belasco received a written warning from Principal Woods-Wallace regarding the same. (State Hearing Transcript at pp. 201-204 and Exhibit WH-10.) On December 16, 2011, Principal Woods-Wallace presented a memorandum to the Human Resources Director as evidence that Ms. Belasco had falsified records. On December 19, 2011, Human Resources Director Bushley; Principal Woods-Wallace; Ms. Belasco; Pam Barnes, the President of the Teachers' Union; and, Ohio Education Labor Relations Consultant Lynn Howell met for a pre-disciplinary hearing. (Deposition of Darlene Bushley at p. 58.)

### 1. Fitness For Duty Examination.

Following the pre-disciplinary hearing, Ms. Belasco was referred for a fitness-for-duty exam with a physical therapist. (State Hearing Transcript at 694:10-695:1 and 769:8-770:12.) Neither Ms. Belasco nor Ms. Howell objected to or filed a grievance regarding the fitness for duty examination. (State Hearing Transcript at 454:8-14 and 77:4-12.) The test was administered on January 10, 2012 and Ms. Belasco failed the test. The report stated as follows:

The issues of unsteady gait (with poor/fair balance) and shortness of breath would interfere with the client's ability to sustain prolonged activity, to maneuver safely or to respond quickly in emergency situations, which are part of her job requirements.

On January 18, 2012, Defendants placed Ms. Belasco on paid administrative leave.

(Prehearing Stipulations at ¶ 13.)

On February 8, 2012, Ms. Belasco requested that she be permitted to take a second fitness for duty examination arranged by her own physician. (State Hearing Exhibit STIP-12.) Ms. Belasco states that she had bronchitis and a blood infection during the first exam and, therefore, her husband contacted University Hospitals to request a second fitness for duty exam, which was completed by a Licensed Occupational Therapist, David Edelstein, on February 16, 2012. Ms. Belasco failed that examination as well. The Report stated as follows:

> The Job Description states that the teacher "Takes responsibility to ensure safety" and "Provides appropriate student supervision." Ensuring safety and providing student supervision may require quick reactions on the part of the teacher. Ms. Belasco displays poor standing balance and shortness of breath with minimally resistive tasks. She would be unable to physically respond in an appropriate way in an emergency situation. Additionally, Ms. Belasco does not meet the strength demands listed by the Dictionary of Occupational Titles.

(State Hearing Transcript at pp. 464-456, 705-09, and State Hearing Exhibit STIP-15.)

Ms. Belasco argues that both of the fitness for duty tests were flawed because they failed to appropriately measure the essential functions of her job as a fourth grade teacher in terms of lifting weight, kneeling and climbing stairs; and, that in both tests, walking and balancing were tested without use of her walker, which Ms. Belasco already used with the District's knowledge during the school day. Ms. Belasco submits an interview with Mark Anderson, President and CEO of Vocational Assessment and Counseling Services and "former elementary school teacher," as an expert witness, who "concluded to a reasonable degree of vocational certainty that

-8-

the two exams were flawed." (Brief in Opposition at p. 10.)

### 2. *Loudermill* **Hearing.**

On April 2, 2012, the District held a *Loudermill* hearing, attended by Ms. Belasco; Superintendent Jones; and Counsel for both Parties, to discuss these concerns. (Prehearing Stipulations at ¶ 12.) On April 12, 2012, the Board passed a Resolution of Intent to Consider Termination of Teaching Contract of Norma Belasco, and notified her of the same. (State Hearing Exhibits STIP-25 and STIP-26.) Pursuant to Ohio Rev. Code § 3319.16, the Notice specified the inability to perform essential job functions; the inability to pass two separate fitness for duty examinations; and, the falsification of District records (grades and reading data), as the reasons for termination. (Id.)

Ms. Belasco states that Defendants never asked her about whether she could perform her position with or without an accommodation and that the only time an accommodation was considered was following the April 2012 *Loudermill* hearing when she requested an aide to accommodate her disability. She recalls being told the District did not have the funding. (Deposition of Norma Belasco at p. 25.)

### 3. **State Level Hearing and Determination.**

On May 30, 2012, pursuant to Ohio Rev. Code § 3319.61, a hearing was held before an Ohio Department of Education Referee. On July 23, 2012, the Referee issued his Report. The Referee found that the alleged failure to perform the essential functions of the job and/or the evidence of the falsification of records were insufficient to recommend termination. However, the Referee determined that the evidence elicited relative to those allegations, taken together with the two fitness for duty examinations, justified termination.

The Referee, stated in part, as follows:

(j) Whether due to one or two troublemakers or a classroom full of miscreants, there is a significant "classroom management" issue in Ms. Belasco's classroom. The school security officer and several administrators and/or staff people have reported a need to frequently respond to Ms. Belasco's room only to find the pupils in total chaos – people out of their seats, desks overturned, students fighting, etc. In the meantime, although present, Ms. Belasco was observed standing by as though in a trance and doing little to quell the disturbance;

(k) Knowledge of these episodes have reached some parents and they have complained to the Superintendent about the lack of an environment in which learning can take place.

(l) The School District is on Academic Alert and Financial Emergency and District leaders have placed a considerable amount of their "educational capital" on the success of a program known as 100 Book Challenge. The general idea is that the program will enhance the students reading levels and that success will motivate the State to cause more money to flow to the District. Some skeptics among the teaching corps believe the program is too complicated to implement and that it was selected from others because it was cheaper than some others that were available;

(m) Without question, whether due to inadequate training, laziness, indifference, etc., Ms. Belasco was substantially deficient in implementing the [100 Book Challenge] program;

(n) Whether due to practices learned while instructing the gifted, laziness, indifference, etc. Ms. Belasco maintained her grade records in a manner unsatisfactory to the school administration and may not have recorded them on a timely basis.

(o) Ms. Belasco registered an abnormally high number of absences and an unsatisfactory number of tardies. To compound matters she declined to use the required network to report these episodes making it difficult for the District to arrange a substitute. When she was late, her fellow teachers or staff people had to attempt to monitor her pupils while carrying on their own duties[.]

(p) The totality of the circumstances, justified the School District in requesting a fitness for duty examination. Ms. Belasco and her Association representatives did not object to the procedure. The exam identified various circumstances where Ms. Belasco's physical conditions would make it difficult for her to adequately respond to predictable happenings in a school setting;

-10-

(q) Ms. Belasco and her representatives requested and were granted a second fit for duty exam to be conducted by professionals of their selection. Once again the examiner identified situations to which Ms. Belasco would not be able to respond due to her physical conditions.

Although permitted to appeal the Referee's decision to the Ohio Court of Common Pleas pursuant to Ohio Rev. Code § 3319.16, Ms. Belasco did not pursue an appeal. On July 31, 2012, the School Board considered the Referee's Report and adopted a resolution to terminate Ms. Belasco's contract.

### C.    FMLA.

Ms. Belasco states that at the time she was removed from teaching and placed on paid administrative leave, she was eligible for, but did not receive, FMLA leave. Ms. Belasco does not remember whether she asked for FMLA leave and has no record of doing so, although she thinks it would have helped with all of her absences because of her renal failure. (Deposition of Norma Belasco at p. 31.)

Defendants examined whether FMLA leave was available but determined that Ms. Belasco did not work enough hours in the one-year period immediately preceding the commencement of leave to qualify for FMLA leave. (Exhibit 16 to Defendants' Motion for Summary Judgment.) Ms. Belasco believes Defendants' calculations to be flawed, arguing the incorrect time period was used; that the number of absences is inaccurate; and, that Defendants failed to consider work done outside the classroom, which she estimates to be one hour per day, plus an estimated extra 240 hours over the summer.

### II.    Procedural History.

Ms. Belasco originally filed her Complaint in this case in the Cuyahoga County Court of

Common Pleas, Case No. 13-800234.  On March 13, 2013, Defendants filed a Notice of Removal to this Court.

In Count One, Ms. Belasco alleges Defendants interfered with her rights under the FMLA by failing to reinstate her at the end of her leave and failing to inform her of her eligibility for leave.  29 U.S.C. § 2615.  In Count Two, Ms. Belasco alleges Defendants discriminated against her on the basis of disability and/or perceived disability and/or on the basis that they regarded her as disabled when they required her to under go a fitness for duty examination; for subsequently firing her for failing the fitness for duty test; by creating a hostile work environment; and, for failing to accommodate her disability, in violation of Ohio Rev. Code § 4112.02.  Ms. Belasco voluntarily dismissed Count Three of her Complaint, in which she alleged age discrimination under Ohio law.  (Docket #21.)

Defendants filed their Motion for Summary Judgment on September 2, 2014.  (Docket #33.)  With regard to her disability discrimination claim, Defendants argue that Ms. Belasco cannot satisfy her prima facie case because she was unable to perform the essential functions of her job and, therefore was not a "qualified individual."  Further, even if she could satisfy a prima facie case, Defendants argue that Ms. Belasco's discrimination claim fails because Ms. Belasco has failed to rebut the legitimate and non-discriminatory reason for the District's decision to terminate her – failing two fitness for duty examinations – which was determined to be justified by the Referee under the procedures outlined in Ohio Rev. Code § 3319.16.  Defendants assert that Ms. Belasco cannot show that the reasons given for terminating her employment (inability to manage classroom; inability to implement the 100 Book Challenge; inability to comply with absence reporting requirements; inability to properly record grades; and, the failure to pass two

-12-

fitness for duty examinations) were pretextual and that a bias against persons with disabilities was the real reason for her termination.

With regard to FMLA, Defendants argue that Ms. Belasco was not entitled to FMLA leave because she did not meet the requisite number of hours worked to qualify.

On October 8, 2014, Ms. Belasco filed her Brief in Opposition. (Docket #42.) Ms. Belasco asserts that the reasons given by Defendants for her termination are either insufficient or a pretext for discrimination. Ms. Belasco argues that she was aware of and reported the disciplinary problems in her class and requested a co-teacher as an accommodation in response thereto; that she recorded grades "differently, not falsely;" that the fitness for duty evaluations did not accurately measure her job; and, that problems with the 100 Book Challenge were not sufficient to justify termination. Ms. Belasco argues that the fitness for duty evaluations should never have been ordered. With regard to the FMLA, Ms. Belasco argues that the District miscalculated her hours worked and, that when calculated accurately, that she qualified for FMLA leave.

On October 22, 2014, Defendants filed their Reply Brief. (Docket #43.) Defendants argue that all of Ms. Belasco's arguments were considered and evaluated by the Referee, pursuant to Ohio Rev. Code § 3319.16, and, that after a three-day hearing, the Referee found the District to be justified in terminating the continuing contract of Ms. Belasco. Defendants state that Ms. Belasco never requested a co-teacher to handle discipline until after she had been placed on paid administrative leave; that the request for a full-time aide could not have been granted because it would have created an undue hardship; and, that the Union representing staff would not approve a part-time aide. Defendants state that two substitute teachers replaced Ms. Belasco

-13-

because of the "state in which she left the classroom."

Further, Defendants state that Ms. Belasco never made any request for help that the District could have reasonably understood as a request for an accommodation for her disability. Defendants argue that Ms. Belasco admitted that classroom management was part of her job description and that she admitted to being unable to control her classroom. Ms. Belasco, however, never indicated that the inability to deal with unruly children was due to her disability; nor did she indicate that she was unable to enter grades and track reading progress due to a disability. Defendants argue that referral for a fitness for duty examination was job-related and consistent with business necessity.

With regard to FMLA leave, Defendants state that when Ms. Belasco was placed on paid administrative leave in January 2012, she never requested that the leave be treated as FMLA leave and that the Human Resources Director later determined Ms. Belasco to be ineligible based upon hours worked. Defendants argue that the gap of 410 hours is so large that it is implausible that Ms. Belasco could have accumulated those hours outside of school. Defendants state their burden is not to identify the exact number of hours worked, but "only to clearly demonstrate that [the teacher] worked less than 1250 hours." *See McArdle v. Town of Dracut/Dracut Public Schools*, 723 F.3d 29, 34 (1st Cir. 2013.)

**Motion to Strike.**

On November 5, 2014, Ms. Belasco filed a Motion to Strike the Expert Trangle, or in the Alternative for Plaintiff to File Attached Surreply. (Docket #42). The Court hereby denies Plaintiff's Motion to Strike; grants Plaintiff's Motion to File Surreply and has considered the same.

-14-

### III.     Summary Judgment Standard.

Summary judgment is appropriate when the court is satisfied "that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  The burden of showing the absence of any such "genuine dispute" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine [dispute] of material fact.

*Celotex v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)).  As a general matter, the district judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Id.*  The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. *Id.* at 249.  Determination of whether a dispute is "genuine" requires consideration of the applicable evidentiary standards.  The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual [disputes] that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

The nonmoving party may not simply rely on its pleadings, but must "produce evidence

-15-

that results in a conflict of material fact to be resolved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. Ky. 1995). FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate. *Id.*

## IV. Discussion.

The Court has thoroughly and exhaustively reviewed the claims raised by Ms. Belasco in this action; Defendants' Motion for Summary Judgment and the briefing responsive thereto; and, all supporting documentation, including a detailed analysis of the deposition testimony and evidentiary materials submitted by both Parties.[2]

Ms. Belasco did not appeal the Referee's determination that her termination was justified and in this case alleges disability discrimination and an FMLA violation. The testimony before the Referee will be considered by the Court for purposes of determining whether Defendants discriminated against Ms. Belasco or wrongfully denied her FMLA leave, not for the purposes of validating or invalidating the Referee's determination.

### A. Discrimination Based On Disability - ADA and Ohio Law.

Ohio Rev. Code § 4112.02(A) provides:

---

[2]
       The Court has thoroughly and exhaustively reviewed the Complaint, in conjunction with the Briefs submitted by the Parties and the documentation and depositions filed in support thereof, for purposes of deciding whether summary judgment is appropriate. The Court gives deference to evidence presented by the non-moving party, in this case, Ms. Belasco, in the event of any conflict.

"It shall be an unlawful discriminatory practice "[f]or any employer, because of the ... [disability] ... of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

The essential elements of a claim brought under the ADA and the Ohio handicap discrimination statute are the same. Therefore, case law regarding claims brought under the ADA applies equally to claims brought under the Ohio statute." *Hoffman v. Fidelity Brokerage Servs., Inc.*, 959 F. Supp. 452, 457 n.1 (S.D. Ohio 1997) (citation omitted); see also *City of Columbus Civil Serv. Comm'n v. McGlone*, 82 Ohio St. 3d 569, 697 N.E.2d 204, 206-07 (Ohio 1998)("The federal [ADA] is similar to the Ohio handicap discrimination law. . . . We can look to regulations and cases interpreting the federal Act for guidance in our interpretation of Ohio law.").

In order to establish a claim under the ADA or Ohio law, the plaintiff must show that (a) he was disabled, (b) was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation, and (c) he suffered an adverse employment action because of a disability. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996), abrogated on other grounds by *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2011) (en banc). The alleged discrimination must have been a "but-for" cause of the employer's adverse decision. *Lewis*, 681 F.3d at 321.

An individual is considered "disabled" under the ADA if she (1) has a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (2) has a record of such impairment, or (3) is regarded by her employer as having such an impairment. *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810 (6th Cir. Mich. 1999); see also, 42 U.S.C. § 12102(2)(A)-(C). An individual is "regarded as having such an impairment" if the individual is subjected to a prohibited action because of an actual or perceived physical or

-17-

mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity. 29 C.F.R. § 1630.2(l)(1) (emphasis added). "Whether an individual's impairment 'substantially limits' a major life activity is not relevant to coverage under paragraph (g)(1)(iii) (the 'regarded as' prong) of this section." § 1630.2(j)(2).

If the plaintiff presents evidence of a prima facie case, then the defendant may produce evidence of a legitimate non-discriminatory reason for its actions. The plaintiff must then introduce evidence to show that the defendant's reason was a mere pretext for illegal discrimination. At all times, the plaintiff bears the ultimate burden of persuasion. *See Monette*, 90 F.3d at 1186.

"An employee can show pretext by offering evidence that the employer's proffered reason had no basis in fact, did not actually motivate its decision, or was never used in the past to discharge an employee." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. Mich. 1998). "In order to prove pretext, therefore, the plaintiff must introduce admissible evidence to show that the proffered reason was not the true reason for the employment decision and that discriminatory animus was the true motivation driving the employer's determination." *Grace v. USCAR*, 521 F.3d 655, 677-78 (6th Cir. Mich. 2008). "An employer may make employment decisions "'for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'" *Brown v. Renter's Choice, Inc.*, 55 F. Supp. 2d 788, 795 (N.D. Ohio 1999) (quoting *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. Fla. 1984)).

### 1. Fitness for Duty Examination.

Ms. Belasco argues that "but for her disability, she would have been accommodated with a co-teacher to handle classroom discipline instead of being discharged upon failing to pass

fitness for duty examinations that were neither job related nor justified by business necessity."

The ADA's prohibition against discrimination includes the prohibition of certain medical examinations and inquiries, stating, "A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). Ms. Belasco claims that the referral for a fitness for duty examination is evidence that Defendants regarded her as disabled, in violation of Ohio Rev. Code § 4112.02.

Employers are permitted to conduct voluntary medical examinations and make inquiries into the ability of an employee to perform job-related functions. *Kroll v. White Lake Ambulance Authority*, 691 F.3d 809, 815, n.7 (6th Cir. Mich. 2012). Medical examinations by employers are permitted "in limited circumstances," confined by "job-relatedness" and "business necessity" requirements. *Id.* (citing *EEOC v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1094 (6th Cir. Mich. 1998) ("[T]he statute was intended to prevent against 'medical tests and inquiries that do not serve a legitimate business purpose'") (citation omitted). The EEOC has explained that this restriction reflects Congress's intent to protect the rights of applicants and employees to be assessed on merit alone, while protecting the rights of employers to ensure that individuals in the workplace can efficiently perform the essential functions of their jobs. *Kroll*, 691 F.3d at 815 (citation omitted).

"[F]or an employer's request for an exam to be upheld, there must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job." *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. Mich. 1999). Moreover, "any examination ordered by the employer must be restricted to discovering whether

-19-

the employee can continue to fulfill the essential functions of the job." *Id.* at 812. "A job function is essential if its removal would fundamentally alter the position." *Kiphart v. Saturn Corp.*, 251 F.3d 573, 584 (6th Cir. Tenn. 2001) (quotations marks and citations omitted). Health problems that significantly affect an employee's performance of essential job functions justify ordering a physical examination, even if the examination might disclose whether the employee is disabled or the extent of any disability. *Sullivan*, 197 F.3d at 812 (citation omitted). The same is true for ordering a mental examination when aberrant behavior similarly affects an employee's job performance. *Id.*

Fitness for duty examinations do not establish a perception of disability and such examinations are not adverse employment actions in the context of civil rights statutes. See *Harrison v. City of Akron*, 43 F. App'x 903, 905 (6th Cir. Ohio 2002) ("Psychological examinations and internal investigations are not adverse actions.") (citation omitted); *Bennett v. Roadway Express, Inc.*, No. 20317, 2001 Ohio App. LEXIS 3394, 2001 WL 866261, at *8 (Ohio Ct. App. Aug. 1, 2001) ("an employer's requirement that an employee submit to a psychiatric evaluation to determine whether the employee could continue to fulfill the essential functions of the position is not tantamount to a perception by the employer that the employee is disabled") (citing *Sullivan*, 197 F.3d at 810-11).

The referral of Ms. Belasco for a fitness for duty examination was justified based on the uncontroverted evidence that Ms. Belasco was unable to manage her classroom; was frequently absent; and, was having difficulty administering the required curriculum and complying with reading and grade reporting requirements. Prior to being referred for the examination, Ms. Belasco met with various individuals to discuss the District's ongoing concerns. The ability to control the classroom; ensure student safety; and, administer the curriculum are essential

-20-

functions of the job. There was significant evidence that could cause a reasonable person to inquire as to whether Ms. Belasco was still capable of performing her job as required. Ms. Belasco also argues that both fitness for duty examinations were flawed and did not accurately assess her job requirements. However, both examiners, including the examiner engaged independently by Ms. Belasco, were provided a copy of the job description for Ms. Belasco's position. Both examiners agreed that Ms. Belasco's physical ailments would prevent her from responding appropriately in emergency situations and the second examination, arranged independently by Ms. Belasco with the District's blessing, resulted in a finding that Ms. Belasco would be unable to ensure student safety and unable to provide appropriate supervision.

Based on the foregoing, Defendants did not discriminate against Ms. Belasco by requiring that she undergo a fitness for duty examination.

### 2. Failure to Accommodate.

Ms. Belasco claims she was otherwise qualified to perform the essential functions of her position if provided with reasonable accommodations and that she was unlawfully denied accommodations that were requested.

In order to establish a prima facie of disability discrimination under the ADA for failure to accommodate, a plaintiff must show that: (1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation. *See DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. Ohio 2004). We use the same analysis for claims of disability discrimination under Ohio law. *Brenneman v. Medcentral Health Sys.*, 366 F.3d 412, 418 (6th Cir. Ohio 2004). Once a plaintiff establishes a prima facie case for failure to accommodate, "the

-21-

burden shifts to the employer to demonstrate that the employee cannot reasonably be accommodated, because the accommodation would impose an undue hardship on the operation of its programs." *DiCarlo*, 358 F.3d at 419 (internal quotation marks omitted).

In order for an accommodation to be reasonable, it should be necessary in light of the plaintiff's known physical limitations. *Johnson v. Cleveland City Sch. Dist.*, 344 Fed. Appx. 104, 112 (6th Cir. Ohio 2011) (citing *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 557 (6th Cir. Tenn. 2008); see also *Jackson v. City of Chicago*, 414 F.3d 806, 813 (7th Cir. Ill. 2005)). A reasonable accommodation includes "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices . . . [or] other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). The employer has a duty to consider transferring the employee to a different position for which he is otherwise qualified but the ADA does not require the employer to create a new position for the plaintiff as an accommodation. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. Ohio 2007). Further, "the ADA does not require employers to accommodate individuals by shifting an essential job function onto others." *Hoskins v. Oakland County Sheriff's Dep't*, 227 F.3d 719, 729 (6th Cir. Mich. 2000); see also 29 C.F.R. pt. 1630, app. § 1630.2(o)("An employer or other covered entity is not required to reallocate essential functions."). Likewise, requiring the employment of two full-time positions to do the job of a single employee poses an undue burden and, therefore, is not a reasonable accommodation. *Johnson v. Cleveland City Sch. Dist.*, 443 Fed. Appx. 974 (6th Cir. Ohio 2011).

Ms. Belasco's deposition testimony, quoted above, makes it clear that in the first half of the 2011-12 school year, she requested help in the classroom as an accommodation to deal with unruly children so that she could focus on teaching, not to accommodate a disability. She testified to using her walker to accommodate her balance and fatigue issues, which the District

permitted. All of Ms. Belasco's arguments in this case rely upon her belief that, at that time, she was otherwise fit for duty.

After failing two fitness for duty examinations, Ms. Belasco was placed on paid administrative leave. Subsequently, Ms. Belasco asserted that had she been able to use her walker during the fitness for duty examinations, she would have passed the examinations and that the use of her walker would render her fit for duty. The District responded, noting that Ms. Belasco would be permitted to continue to use her walker, as she had in the past, but needed to provide certification that the walker would allow her to perform the essential functions of her job, thus curing the deficiencies in her fitness for duty examinations, before she could return to work. Specifically, the District wrote, "The District is willing to continue to allow you the use of a walker; however, you will need to provide a certification from your doctor reflecting that your use of the walker will allow you to perform the essential functions your job." (See Letter dated April 9, 2012 from Darlene Bushley, Director of Human Resources, to Norma Belasco (Exhibit 11 to Defendants' Motion for Summary Judgment).) In a follow up email, attorneys for the District stated:

> The District requires certification that with a walker, Mrs. Belasco can perform the essential functions of her position in both emergency and non-emergency situations. To be clear, the doctor's certification referenced in the District's April 9, 2012 letter must be provided by either of the health care providers that completed Mrs. Belasco's fitness for duty evaluations on January 10, 2012 at the Cleveland Clinic or February 16, 2012 at University Hospitals. As stated in the letter, please contact myself or my colleague Inajo Davis Chappell, should your client wish to submit any additional accommodations for the District's consideration.

(E-mail between the Parties attorneys dated April 12, 2012 (Exhibit 12 to Defendants' Motion for Summary Judgment)). There is no evidence before the Court that any such certification was provided.

Further, Ms. Belasco asserted that if the District would provide the assistance of a full

time educational aide or part-time teacher's aide as an accommodation, she could perform the essential functions of her job. (Exhibit 12 to Defendants' Motion for Summary Judgment.) The District informed Ms. Belasco that it was unable to assign a teaching aide to the classroom because it would impose an undue hardship, in essence hiring two full-time teachers to fulfill the job responsibilities ordinarily assigned to one person, on the District. *Johnson v. Cleveland City School Dist.*, 443 Fed. Appx. 974, 986 (6th Cir. Ohio 2011). (Email between the Parties' attorneys dated Wednesday, April 18, 2012, Exhibit 13 to Defendants' Motion for Summary Judgment.)  The District also contacted the staff and employee's Union to determine if a part-time aide could be provided, but was informed that the collective bargaining agreement was prohibitive. (Exhibit 13 to Defendants' Motion for Summary Judgment.)  While two substitute's were assigned to handle Ms. Belasco's class at the time she was placed on paid administrative leave, there is no evidence that two, full-time teachers were hired to replace Ms. Belasco, as she suggests.

In addition to the foregoing, the District noted in its correspondence with Ms. Belasco that it made a concerted effort to identify other potential accommodations, including transfer to another position for which she would be otherwise qualified, but that no positions were available. (Exhibit 11 to Defendants' Motion for Summary Judgment.) The District also informed Ms. Belasco that it would be receptive to entertaining any additional accommodations that she believed would allow her to return to work. (Id.) There is no evidence before the Court that any additional accommodations, aside from the use of her walker and a co-teacher or aide, were requested. "An employer has sufficiently acted in good faith when it readily meets with the employee, discusses any reasonable accommodations, and suggests other possible positions for the plaintiff." *Johnson v. Cleveland City Sch. Dist.*, 443 Fed. Appx. 974, 987 (6th Cir. Ohio

-24-

2011) (citing *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 557 (6th Cir. Tenn. 2008)).[3]

Based on the foregoing, to the extent Ms. Belasco raises a claim for failure to accommodate, said claim fails as a matter of law.

### 3. Disability Discrimination.

There is no evidence before the Court to support Ms. Belasco's claim that she would have been accommodated with a co-teacher to handle classroom discipline "but for" her disability. The District could not accommodate Ms. Belasco's request for a co-teacher or aide based on undue hardship and/or provisions of the applicable collective bargaining agreement and, while two substitutes worked to handle Ms. Belasco's class when she was placed on paid administrative leave because the class needed to get caught up (State Hearing Transcript at p. 648-50), there is no evidence in the record that a full-time teacher was hired to replace Ms. Belasco and also provided with a full time co-teacher. Further, there is no evidence to support Ms. Belasco's conclusory statement that had she "not been disabled . . . she would still be teaching in a classroom with a full-time teacher handling discipline." (Brief in Opposition at p. 20.) Stated simply, there is no evidence in the entire Record before the Court that the District denied Ms. Belasco's request for a co-teacher because of her disability.

---

[3]
     Correspondence between Counsel for Ms. Belasco and the District indicates, as set forth above, that the District would have allowed Ms. Belasco to return to work if she received certification from either evaluating therapist that the use of her walker made her fit for duty. However, there is no evidence that the use of a walker would have addressed the deficiencies in implementing the reading program; reporting grades; or, Ms. Belasco's attendance issues. Adding a co-teacher or aide to the classroom, if otherwise feasible, would arguably give Ms. Belasco more time to administer the reading curriculum and/or enter grades, just as it would for any teacher in the building. However, while Ms. Belasco's physical limitations may have affected her ability to maintain order in the classroom or respond appropriately in emergency situations, Ms. Belasco does not argue that physical limitations resulted in her inability to effectively administer curriculum or report grades.

Further, there is no evidence that Ms. Belasco's termination was motivated by a discriminatory animus, therefore, even if she could otherwise prove a prima facie case of disability discrimination, her claim ultimately fails. "An employee can show pretext by offering evidence that the employer's proffered reason had no basis in fact, did not actually motivate its decision, or was never used in the past to discharge an employee." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. Mich. 1998). In order to prove pretext, Ms. Belasco must show that the proffered reason was not the true reason for the employment decision and that discriminatory animus was the true motivation driving the employer's decision. An employer may make employment decisions "'for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'" *Brown v. Renter's Choice, Inc.*, 55 F. Supp. 2d 788, 795 (N.D. Ohio 1999) (quoting *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. Fla. 1984)).

The evidence of record demonstrates the District's decision to place Ms. Belasco on paid administrative leave and to subsequently terminate her employment was based two failed fitness for duty examinations;[4] Ms. Belasco's failure to control her classroom; failure to properly implement the District's reading program; failure to accurately enter grades; and, excessive undocumented tardies and/or absences. All of these issues were independently reviewed and examined through the hearing and termination process required under her teaching contract. Ms. Belasco's employment was terminated by the District following a hearing before an Ohio Department of Education Referee and the Referee believed termination was justified based on the facts and circumstances presented. The Court has thoroughly examined all of the testimony and

---

[4] Both examinations noted issues with gait, balance and unsteadiness that would limit Ms. Belasco's ability to respond appropriately in emergency situations.

documentation of record. There is nothing in the record to suggest that a discriminatory animus was the true motivating factor in any decision made by the District with regard to Ms. Belasco's employment.

Based on the foregoing, Ms. Belasco's disability discrimination claim under Ohio law fails as a matter of law.

### B.     FMLA Claim.

In this case, Ms. Belasco was placed on paid administrative leave from the time of her failed fit for duty examination until her termination – approximately six months.  Ms. Belasco claims she was entitled to take FMLA leave, beginning January 17, 2013; that the District did not give her proper notice of her rights and responsibilities under the FMLA; and, that had her leave been designated as FMLA leave, she would have been entitled to reinstatement at the end of 12 weeks, on or around April 10, 2012, because at that time she was feeling better.

The FMLA provides an eligible employee with twelve work-weeks of unpaid leave during any twelve-month period if she has "a serious health condition that makes [her] unable to perform the functions of [her] position." 29 U.S.C. § 2612(a)(1)(D).  The Sixth Circuit has recognized two theories of recovery under the FMLA – interference and retaliation.  With regard to interference claims, the FMLA provides that it is unlawful "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" rights under the FMLA. 29 U.S.C. § 2615(a)(1).  To establish an interference claim, the plaintiff must show that: "(1) he was an eligible employee; (2) Defendant was an employer subject to the FMLA; (3) he was entitled to leave under the FMLA; (4) he gave his employer notice of his intention to take FMLA leave; and (5) Defendant denied him FMLA benefits to which he was entitled." *Romans v. Mich. Dep't of*

*Human Servs.*, 668 F.3d 826, 840 (6th Cir. Mich. 2012). "The FMLA provides no relief unless

the plaintiff has been prejudiced by the violation." *Harris v. Metro. Gov't of Nashville &*

*Davidson Cnty., Tennessee*, 594 F.3d 476, 482 (6th Cir. Tenn. 2010).[5] *See Verdake v. United*

*States Postal Serv.*, 378 F. App'x 567, 575 (6th Cir. Mich. 2010) (explaining that a technical

violation of the FMLA is not actionable unless the employee suffers some prejudice or harm as a

result).

In order to invoke the protection of the FMLA, an employee must provide notice and a

qualifying reason for requesting leave. *Brohm v. JH Props., Inc.*, 149 F.3d 517, 523 (6th Cir. Ky.

1998). There is, however, no requirement that an employee expressly invoke the FMLA. Rather,

the Sixth Circuit has held that "the critical question is whether the information imparted to the

employer is sufficient to reasonably apprise it of the employee's request to take time off for a

serious health condition." *Brohm*, 149 F.3d at 523. Thus, the burden is on the employer to

request medical certification when it is aware of facts that indicated that a leave might be covered

by the FMLA. *See Cavin v. Honda of America Mfg., Inc.*, 346 F.3d 713, 723 (6th Cir. Ohio 2003)

(holding that employers cannot deny FMLA relief for an employee's failure to comply with the

employer's internal notice requirements).

---

[5]

    Ms. Belasco's Complaint does not include a claim that she was retaliated against
for exercising her rights under the FMLA. However, in the last paragraph of her Brief in
Opposition, Ms. Belasco states conclusorily that "had she not . . . exercised her leave
right under the FMLA, she would still be teaching in a classroom with a full-time teacher
handling discipline." (Brief in Opposition at p. 20.) There is absolutely no evidence that
Ms. Belasco requested or attempted to request FMLA leave; no evidence that anyone
retaliated against Ms. Belasco for the exercise of any right under the FMLA; and, no
evidence that even if she were eligible and had taken FMLA leave during the time period
in question that "she would still be teaching in a classroom with a full-time teacher
handling discipline."

Ms. Belasco never requested FMLA leave from the District when she was placed on paid administrative leave in January 2012.[6] (Deposition of Norma Belasco at p. 33.) Nevertheless, the District did look into Ms. Belasco's eligibility and, on March 12, 2012, calculated that she was ineligible for FMLA leave because she did not work the requisite number of hours to qualify under 29 U.S.C. § 2611(2)(A)(ii). (Exhibit 16 to Defendants' Motion for Summary Judgment.) The Parties dispute whether Ms. Belasco was in fact eligible for FMLA leave, based on calculations of the hours she had worked during the previous year. However, even if the Court assumes Ms. Belasco had worked the requisite number of hours to qualify for FMLA leave, and even if the first twelve weeks of her leave were designated as FMLA leave, Ms. Belasco would not have been entitled to reinstatement under the facts and circumstances of this case.

"The right to reinstatement guaranteed by 29 U.S.C. § 2614(a)(1) is the linchpin of the entitlement theory because 'the FMLA does not provide leave for leave's sake, but instead provides leave with an expectation [that] an employee will return to work after the leave ends.'" *Edgar v. JAC Prods.*, 443 F.3d 501, 507 (6th Cir. Mich. 2006) (quoting *Throneberry v. McGehee Desha County Hosp.*, 403 F.3d 972, 978 (8th Cir. Ark. 2005)). However, "an employee loses the right to reinstatement 'if the employee is unable to perform an essential function of the position

---

[6]

      Ms. Belasco had previously requested and was granted FMLA leave in Spring 2011 when she had open heart surgery. (State Hearing Transcript at pp. 475 and 510.)

      Ms. Belasco stated during deposition that although it would have helped in the fall of 2011 because she was absent quite a bit, she does not remember requesting a leave of absence and has no record of requesting a leave of absence prior to being placed on paid administrative leave in January 2012. (Deposition of Norma Belasco at p. 32.) There is no evidence that Ms. Belasco was prohibited from taking days off prior to being placed on paid administrative leave, despite the fact that she had exceeded her permissible sick days. (State Hearing Transcript at pp. 688-89.) The District counted Ms. Belasco's sick days in calculating her FMLA eligibility. (Id.)

because of a physical or mental condition . . . .'" *Id.* at 516 (quoting 29 C.F.R. § 825.214(b));

*Kohls v. Beverly Enters. Wis., Inc.*, 259 F.3d 799, 805 (7th Cir. 2001) (citing 29 U.S.C. §

2614(a)(3)(B)); see also 29 C.F.R. § 825.216(a) ("An employee has no greater right to

reinstatement or to other benefits and conditions of employment than if the employee has been

continuously employed during the FMLA leave period."). The FMLA regulation omits the

qualifying "with or without reasonable accommodation" but instead states that the employer may

have obligations under the ADA.  29 C.F.R. 825.214(b).

Ms. Belasco argues that her absence from January 17, 2012 until April 10, 2012 (12

weeks) should have been deemed FMLA leave, therefore entitling her to reinstatement at the end

of 12 weeks, stating that her health condition improved substantially by that point.  However,

under the facts as related to this Court, Ms. Belasco would not have been entitled to

reinstatement in April 2012, or at any other time during her six-month paid administrative leave,

because she failed to demonstrate she was able to perform the essential functions of her job.

As discussed above, Ms. Belasco failed two separate fitness for duty examinations.  Ms.

Belasco argues that the fit for duty examinations were flawed – specifically that the tests included

unnecessarily stringent criteria and that if permitted to use her walker she would have performed

differently – but never provided the District with the requested certification that the use of her

walker rendered her fit for duty.  The District specifically informed Ms. Belasco that if it

received certification from either of the doctors who completed the fitness for duties

examinations that the use of her walker cured the deficiencies in her exam, then she would be

permitted to return.  There is no evidence that such certification was provided.  Further, the

District was unable to accommodate Ms. Belasco's requests for a co-teacher or part-time aide in

-30-

the classroom based on undue hardship and/or the applicable collective bargaining agreement. Accordingly, Ms. Belasco could not have returned to work in April 2012 because she was unable to perform the essential functions of her job; had not provided certification from the examining doctor that use of walker rendered her fit for duty; the requested accommodation of adding another teacher or aide to Ms. Belasco's classroom would have imposed an undue hardship on the District; and, no other accommodations were identified.

Ms. Belasco was placed on paid administrative leave for 6 months, far longer than the 12 weeks of unpaid leave required under the FMLA and, for the reasons stated above, was not entitled to be reinstated prior to the time she was terminated. Ms. Belasco has presented no evidence that she was prejudiced by Defendants' alleged failure to provide notice of her rights and responsibilities under the FMLA or the fact that her leave was not designated as FMLA leave. Accordingly, Defendants are entitled to summary judgment on Ms. Belasco's FMLA claim.

**IV.    Conclusion.**

Reviewing Defendants' Motion for Summary Judgment in the light most favorable to Ms. Belasco, there are no genuine disputes as to any material facts in this case and Defendants are entitled to summary judgment as to Ms. Belasco's claims.

The Motion for Summary Judgment Filed by Defendants (Docket #33) is hereby GRANTED. This case is hereby TERMINATED. All other pending motions are terminated.

IT IS SO ORDERED.

DONALD C. NUGENT
United States District Judge

DATED: January 15, 2015

-31-